**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and Class Members*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JESUS BORJA, *on behalf of himself,*
*FLSA Collective Plaintiffs, and Class Members,*

Plaintiff,

v.

ANYTIME SOJU INC d/b/a ANYTIME KITCHEN,
ANYTIME KARAOKE INC d/b/a ANYTIME KARAOKE,
112 WEST INC d/b/a ANYTIME BAR & BILLIARDS,
34 SIS INC d/b/a ANYTIME STREET ST. MARKS,
K2 YH INC d/b/a THE SPOT,
1550 CHOIS INC d/b/a ANYTIME KITCHEN,
2023 C2 INC d/b/a JAWS TOPOKKI,
218 CHOIS INC d/b/a JAWS TOPOKKI,
SUNGKYU CHOI a/k/a SAMMY CHOI,
YOUNGHOON CHOI a/k/a ALEX CHOI; and
SEUNGEUN JEONG a/k/a RACHEL JEONG,

Defendants.

---

Case No:

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Plaintiff, JESUS BORJA ("Plaintiff"), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this Class and Collective Action Complaint against Defendants, ANYTIME SOJU INC d/b/a ANYTIME KITCHEN, ANYTIME KARAOKE INC d/b/a ANYTIME KARAOKE, 112 WEST INC d/b/a ANYTIME BAR & BILLIARDS, 34 SIS INC d/b/a ANYTIME STREET ST. MARKS, K2 YH INC d/b/a THE SPOT, 1550 CHOIS

INC d/b/a ANYTIME KITCHEN, 2023 C2 INC d/b/a JAWS TOPOKKI, 218 CHOIS INC d/b/a JAWS TOPOKKI (collectively as the "Corporate Defendants"), SUNGKYU CHOI a/k/a SAMMY CHOI, YOUNGHOON CHOI a/k/a ALEX CHOI, and SEUNGEUN JEONG a/k/a RACHEL JEONG (the "Individual Defendants," collectively with Corporate Defendants, "Defendants") and states as follows:

## INTRODUCTION

1. Plaintiff alleges that, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid overtime premiums due to improper fixed salary compensation, (2) unpaid tips due to tip retention, (3) liquidated damages for unpaid overtime and tips, and (4) attorneys' fees and costs.

2. Plaintiff additionally alleges that, pursuant to the New York Labor Law ("NYLL"), he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid minimum wages and overtime premiums due to misclassification, (2) unpaid tips due to tip retention, (3) unpaid spread of hours premiums, (4) liquidated damages for unpaid wages, overtime, tips, and premium pay, (5) statutory penalties due to WTPA violations, and (6) attorneys' fees and costs.

3. Plaintiff further alleges that, pursuant to the New Jersey Wage and Hour Law, N.J. Rev. Stat. §§ 34:11-56a1 *et seq.* ("NJWHL"), he and similarly situated individuals employed by Defendants in New Jersey State are entitled to recover from Defendants: (1) unpaid minimum wages and overtime premiums due to misclassification, (2) unpaid tips due to tip retention, (3) liquidated damages for unpaid wages, overtime, and tips, and (4) attorneys' fees and costs.

4. Plaintiff further alleges that, pursuant to the New Jersey Wage Payment Law N.J. Rev. Stat. §§ 34:11-4.1 *et seq.* ("NJWPL"), he and others similarly situated are entitled to recover

from Defendants: (1) unpaid tips due to tip retention, (2) liquidated damages for unpaid wages, overtime, and tips, (3) statutory penalties due to wage statement and wage notice violations, and (4) attorneys' fees and costs.

5. Plaintiff individually alleges that, pursuant to the New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL"), Plaintiff was deprived of his statutory rights due to Defendants' discrimination based on Plaintiff's age, and seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, (4) damages for emotional distress, and (5) attorneys' fees and costs.

6. Plaintiff additionally individually alleges that, pursuant to the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), Plaintiff was deprived of his statutory rights due to Defendants' discrimination based on Plaintiff's age, and seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, (4) damages for emotional distress, and (5) attorneys' fees and costs.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

8. Venue is proper in the Southern District pursuant to 28 U.S.C. §1391. Defendants mainly reside and operate in New York County, New York.

## PARTIES

9. Plaintiff, for all relevant time periods, was a resident of Queens County, New York.

### The Corporate Defendants

10. Defendants collectively own and operate a restaurant enterprise known as

"Anytime Hospitality"[1] which features Korean-themed restaurants, karaoke lounges, pool bars, and catering services. Defendants' enterprise currently has venues at the following locations throughout Manhattan and New Jersey:

i. "Anytime Kitchen" – 23 W 32nd Street, 3rd Floor, New York, NY 10001;
ii. "Anytime Karaoke" – 23 W 32nd Street, 4th Floor, New York, NY 10001;
iii. "Anytime Bar & Billiards" – 112 W 30th Street, 1st Floor, New York, NY 10001;
iv. "Anytime Street St. Marks" – 34 St. Marks Place, New York, NY 10003;
v. "The Spot" – 34 W 32nd Street, New York, NY 10001;
vi. "Anytime Kitchen (Fort Lee)" – 2025 Lemoine Ave, Fort Lee, NJ 07024;
vii. "Jaws Topokki (Palisades Park)" – 110 Broad Avenue, 2nd Floor, Palisades Park, NJ 07650; and
viii. "Jaws Topokki (Closter)" – 218 Closter Dock Rd, Closter, NJ 07624.

(collectively, the "Restaurants").[2]

11. Defendants also provide catering services through the "Mat Time by Anytime" brand, which operates out of their Jaws Topokki (Closter) location.[234]

12. Corporate Defendant ANYTIME SOJU INC is a domestic business corporation which operates Anytime Kitchen.

13. Corporate Defendant ANYTIME KARAOKE INC is a domestic business corporation which operates Anytime Karaoke.

14. Corporate Defendant 112 WEST INC is a domestic business corporation which

[1] https://www.anytimehospitalityus.com/
[2] https://www.anytimehospitalityus.com/our-location
[3] https://www.anytimehospitalityus.com/matbyanytime
[4] https://matbyanytime.com/

operates Anytime Bar & Billiards.

15. Corporate Defendant 34 SIS INC is a domestic business corporation which operates Anytime Street St. Marks.

16. Corporate Defendant K2 YH INC is a domestic business corporation which operates The Spot.

17. Corporate Defendant 1550 CHOIS, INC is a foreign business corporation (organized under the laws of the State of New Jersey) which operates Anytime Kitchen (Fort Lee).

18. Corporate Defendant 2023 C2 INC is a foreign business corporation (organized under the laws of the State of New Jersey) which operates Jaws Topokki (Palisades Park).

19. Corporate Defendant 218 CHOIS, INC is a foreign business corporation (organized under the laws of the State of New Jersey) which operates Jaws Topokki (Closter) and the Mat by Anytime Hospitality catering service.

**The Individual Defendants**

20. Individual Defendants SUNGKYU CHOI (a/k/a SAMMY CHOI) and YOUNGHOON CHOI (a/k/a ALEX CHOI) are brothers.[5] Together, they are both co-Founders and co-Chief Executive Officers of Anytime Hospitality, as well as all Corporate Defendants and Restaurants.[5]

21. Individual Defendant SEUNGEUN JEONG (a/k/a RACHEL JEONG) is Defendant SUNGKYU CHOI's wife. Defendant JEONG is a principal and managing member of all Corporate Defendants and Restaurants.

22. At all relevant times, the three Individual Defendants each exercised direct and actual functional control and oversight of the business and financial operations, as well as all other

[5] https://www.anytimehospitalityus.com/aboutus

general affairs, of all Corporate Defendants and Restaurants.

23. At all relevant times, the three Individual Defendants each exercised the direct and actual power and authority (and also delegated the power and authority to managers and supervisors) to: (i) hire and fire all employees and Managers of the Restaurants (including Plaintiff, FLSA Collective Plaintiffs, and Class Members), (ii) determine their hourly rates or salaries, frequencies of payments, and means of payments, (iii) establish, alter, or otherwise affect their work schedules, (iv) otherwise directly or indirectly affect the qualities, terms and conditions of their employments, and (v) maintain their employment records.

24. At all relevant times, the three Individual Defendants each ensured that their Restaurants operated efficiently and profitably by frequently visiting their Restaurants to: (i) inspect the operations and quality of food, service, and hygiene of the Restaurants, (ii) meet and confer with the Restaurants' management teams to discuss operations, sales, and overall status of the Restaurants and their employees, (iii) pick up or drop off supplies, ingredients, or paperwork, (iv) personally supervise employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) and managers and monitor their individual performances of duties and behaviors to ensure they effectively completed their job duties, and (v) directly or indirectly reprimand any employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) or managers who did not perform their duties sufficiently or correctly, or displayed inappropriate behavior.

25. At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members would be informed by their managers that the Individual Defendants were owners of their respective Restaurants, and when the Individual Defendants visited their respective Restaurants, the employees would be made aware by their Managers that an Owner was present. At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members had the ability to, and/or actually

did, complain to each of the three Individual Defendants (via direct contact during their visits to the Restaurants or by digital communications) directly regarding any of the terms of their employments, and each of the three Individual Defendants would have the actual power and authority to immediately, directly, and actually affect any changes to the qualities and terms of their employments to appease employees' complaints (including, but not limited to, immediately directly changing their schedules, compensation, locations, or positions).

26. At all relevant times, each of the three Individual Defendants' roles, and the decisions made in connection to their roles, directly and actually affected the nature, conditions, and circumstances of Plaintiff's, FLSA Collective Plaintiffs', and Class Members' employments.

**Defendants' Single Integrated Enterprise**

27. The Restaurants are operated by the three Individual Defendants, by and through all Corporate Defendants, as a single integrated enterprise. The Restaurants are commonly owned, operated, controlled, and managed by all of the three Individual Defendants, who are each a principal member of all the Restaurants' operating entities and have the power to make binding decisions for the entities.

28. Defendants advertise on their website that the CHOI defendants are brothers and are the co-owners, co-founders, and co-CEO's of Anytime Hospitality.[6] *See* **Exhibit A**.

29. Defendants collectively advertise all their Restaurants on their individual Instagram profile for Anytime Hospitality.[7] On one post on this profile, Defendants identify all the Restaurants as "Anytime Hospitality location[s]."[8] *See* **Exhibit B**.

30. Defendants encourage followers and customers of the Restaurants to visit other

---

[6] https://www.anytimehospitalityus.com/aboutus
[7] https://www.instagram.com/anytimehospitality/
[8] https://www.instagram.com/anytimehospitality/p/DLQan9gv8P2/

Restaurants through cross-advertisements and cross-promotions. For example, customers who dined at Anytime Kitchen can show their receipts at Anytime Karaoke for a 15% discount.[9] *See* **Exhibit C**.

31. In April 2025, The M Magazine published an article covering the Individual Defendants' foundation, ownership, and operation of the Anytime Hospitality restaurant enterprise, as well as future plans for the business.[10][11][12] *See* **Exhibit D1**; *see also* **Exhibit D2** (English translation of the article by Google Lens).

i. Page 1, the cover page, features a picture of all three Individual Defendants and a caption which describes the article as "The story of owner brothers Sammy Choi & Alex Choi" (translated from Korean). *Id.*, page 1;

ii. Page 2 recounts how the two defendant CHOI brothers came up with the idea to start the Anytime Hospitality business and created the Anytime brand name. *Id.*, page 2;

iii. Page 3 details the Defendants' inception of the Anytime Hospitality enterprise, starting with them opening Anytime Kitchen in 2018 and later expanding their enterprise to New Jersey. Page 3 also features an image of Defendants SUNGKYU CHOI and SEUNGEUN JEONG together, and two images of them together with their daughter. *Id.*, page 3;

iv. Pages 4-6 go into further detail on the two defendant CHOI brothers' experiences working together as brothers and running the Anytime Hospitality enterprise, including their past challenges and future plans for

[9] https://www.instagram.com/p/DIovgA8OPPw/
[10] https://issuu.com/mpluscreative/docs/april_2025_the_m_
[11] https://www.anytimehospitalityus.com/_files/ugd/c63063_1b10168f819d4b56ab5c83df383288ee.pdf
[12] https://www.instagram.com/p/DJXMT8NPUWC/?img_index=1

the business. *Id.*, pages 4-6.

32. On August 18, 2025 MTN News published an article covering an interview they held with Individual Defendant SUNGKYU CHOI.[13] The article identifies SUNGKYU CHOI as the CEO of Anytime Hospitality and details his future plans for Defendants' enterprise.

33. Throughout the relevant period, Defendants interchanged employees and supplies between the Restaurants (especially Anytime Kitchen and Anytime Karaoke as they are located in the same building, The Spot which is located on the same block, and Anytime Bar & Billiards which is located two blocks away from these three Restaurants).

34. Individual Defendant SEUNGEUN JEONG is registered with The New York State Liquor Authority as a Principal and the liquor license applicant of Defendants' New York Restaurants (*see* **Exhibit E**). Pursuant to the New York State Liquor Authority Handbook for Retail Liquor Licensees, New York State liquor license holders must (1) prevent sales of liquor to minors, (2) prevent disorder, (3) confine service and consumption of liquor to the licensed area, (4) prevent sales of liquor to visibly intoxicated persons, (5) prohibit their businesses from offering unlimited drink specials, (6) ensure licensed restaurants have suitable kitchen facilities to prepare and serve a full menu whenever their business is open, (7) prevent individuals from appearing nude or partially nude on the licensed premises, (8) prevent the premixing of liquor, (9) prevent the refilling of liquor, (10) prevent possession of untaxed cigarettes & tobacco products, (11) prevent contamination of bottles, (12) maintain adequate books and records of all transactions involving the licensed business, (13) ensure proper identification of all beer taps, (14) ensure compliance with all stipulations and conditions of the liquor license agreement, (15) comply with all state and local laws and regulations governing the operations of the licensed business. *See* the

---

[13] https://news.mtn.co.kr/news-detail/2025081403123174290

New York State Liquor Authority Handbook for Retail Liquor Licensees, as amended July 31, 2025, pgs. 17-21.[14] Because the Individual Defendant is the liquor licensee for Defendants' New York Restaurants, the Individual Defendant SEUNGEUN JEONG is required by New York State law to personally ensure all New York Restaurants comply with the above 15 requirements. Specifically:

> "You as the licensee are responsible for the activities of employees and patrons in all parts of the licensed premises (even if you are not always physically present) to ensure that the business is operating in accordance with the ABCL. The following are common issues faced by retailers that could subject you to disciplinary action if you do not meet your responsibilities as a licensee." *Id.*, pg. 17.[14]

35. Therefore, in order for Individual Defendant JEONG to comply with her legal responsibilities as the license holder of Defendants' New York Restaurants, she is required to visit the premises of these Restaurants and conduct regular internal auditing of their operations.

36. As the liquor licensee for Defendants' New York Restaurants, Individual Defendant JEONG is required by New York State law to personally impose a very specific degree of management and control of these Restaurants' operations and their employees' performance and to also comply with all state and local laws which govern these Restaurants' business operations, including (i) the New York Labor Law, (ii) the New York Codes, Rules and Regulations, (iii) the New York City Administrative Code, (iv) the New York State Human Rights Law, and (v) the New York City Human Rights Law, among others. Failure to do so would be in violation of Defendants' liquor license agreement and the provisions of the New York State Alcoholic Beverage Control Law, which could result in disciplinary action by the New York State Liquor Authority, including (i) arrest, (ii) fines of up to $10,000 per violation, or (iii) the

[14] https://sla.ny.gov/system/files/documents/2025/08/stateliquorauthority-retaillicenseeshandbookrevised7-31-2025.pdf

suspension, cancellation, or revocation of the liquor license. *See id.*; *see also* the New York Alcoholic Beverage Control Law, Chapter 478 of the Laws of 1934.

37. At all relevant times, Individual Defendant JEONG complied with the New York State Alcoholic Beverage Control Law and the provisions of her liquor license agreement with the New York State Liquor Authority (except for her requirement to comply with all other state and local laws) by personally appropriately managing and controlling the operations of Defendants' New York Restaurants, sufficiently supervising their employees, and maintaining all necessary books and records.

38. Due to the foregoing, Defendants' Restaurants share common ownership and management by all three Individual Defendants, as well as a lawfully-mandated high-degree of management, supervision, and governance by Individual Defendant SEUNGEUN JEONG.

39. Although Plaintiff did not work at all of Defendants' Restaurants, and only at Anytime Kitchen, all the Restaurants and Corporate Defendants are still appropriately named in the Complaint because Defendants operated them all as a single integrated enterprise. Defendants' Restaurants share: (i) common ownership by the Individual Defendants, (ii) interrelation of operations, (iii) centralized control of labor relations; and (4) common management and bookkeeping by Individual Defendant SEUNGEUN JEONG as required by New York State law.

40. At all relevant times, each of the Corporate Defendants was and continues to be an "enterprise engaged in commerce" within the meaning of the NYLL.

41. At all relevant times, the work performed by Plaintiff and Class Members was directly essential to the business operated by Defendants.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

42. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section

16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt employees (including Servers, Waiters, Porters, Bussers, Bartenders, Food Runners, Barbacks, Cashiers, Line Cooks, Hostesses, and Dishwashers, among others), employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein (herein, "FLSA Collective Plaintiffs").

43. At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay Plaintiff and FLSA Collective Plaintiffs their proper overtime premiums at one and a half times their regular rates for all hours worked over forty (40) in a workweek, due to Defendants' policy of improper fixed salary compensation. Defendants also failed to compensate Plaintiff and a subclass of FLSA Collective Plaintiffs who were employed in tipped positions the full amount of their properly owed tips due to Defendants' policy of tip retention. The claims of Plaintiff stated herein are essentially the same as those of the other FLSA Collective Plaintiffs.

44. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ALLEGATIONS

45. Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt employees (including Servers, Waiters, Porters, Bussers, Bartenders, Barbacks, Food Runners, Line Cooks, Hostesses, and Dishwashers, among

others) employed by Defendants on or after the date that is six years before the filing of the Complaint in this case (the "Class" or "Class Members"). Additionally, there exists a Subclass of employees employed by Defendants in tipped positions (including Servers, Waiters, Porters, Bussers, Bartenders, Barbacks, and Food Runners, among others) (the "Tipped Subclass" or "Tipped Subclass Members"). Lastly, there also exists a Subclass of employees employed by Defendants in New York State. Plaintiff is a member of the Class, the New York Subclass, and the Tipped Subclass.

46. The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the positions held, and rates of pay for each Class member may also be determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

47. The proposed Class is so numerous such that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown because the facts on which the calculation of that number rests are presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class, the Tipped Subclass, and the New York Subclass.

48. Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions.

49. All the Class Members were subjected to the same corporate practices by

Defendants, as alleged herein, of Defendants' (1) failure to compensate overtime premiums due to misclassification, (2) failure to provide proper wage and hour notices, at dates of hiring and annually thereafter, per requirements of the New York Labor Law and the New Jersey Wage Payment Law, and (3) failure to provide proper wage and hour statements, per requirements of the New York Labor Law and New Jersey Wage Payment Law.

50. Additionally, all New York Subclass Members were subjected to the same corporate policy of Defendants, as alleged herein, of Defendants' failure to compensate spread of hours premiums for all workdays with a spread of ten or more hours.

51. Further, all Tipped Subclass Members were subjected to Defendants' corporate policy of tip retention.

52. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures of Defendants.

53. Plaintiff is able to fairly and adequately protect the interests of the Class, the Tipped Subclass, and the New York Subclass and has no interests antagonistic to the Class or either Subclass. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

54. A class action is superior to other available methods for the fair and efficient adjudication of the controversy—particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated

persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

55. Defendants and other employers throughout the state violate the New York Labor Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

56. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a) Whether Defendants employed Plaintiff and Class Members within the meaning of the New York Labor Law, the New Jersey Wage and/or Hour Law and New Jersey Wage Payment Law;

b) What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly;

c) At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiff and Class Members for their work;

d) Whether Defendants properly notified Plaintiff and the Class Members of their hourly rates and overtime rates;

e) Whether Defendants provided Plaintiff and New York Class Members with proper wage and hour notices, at their dates of hiring and prior to rate changes, per requirements of the New York Labor Law;

f) Whether Defendants provided Plaintiff and New York Class Members with proper wage statements with each payment of wages, as required by the New York Labor Law and the New Jersey Wage Payment Law;

g) Whether Defendants properly compensated overtime premiums to Plaintiff and Class Members for their overtime hours worked under New York and New Jersey State laws;

h) Whether Defendants properly compensated spread of hours premiums to Plaintiff and New York Subclass Members for all their workdays with a spread of ten or more hours under New York State law;

i) Whether Defendants properly compensated Plaintiff and Tipped Subclass

Members the full amount of their properly owed tips; and

j) Whether Defendants retained any portions of Plaintiff's and Tipped Subclass Members' tip earnings.

## STATEMENT OF FACTS

### i. Background of Plaintiff's Employment with Defendants

57. In or around October 2021, Plaintiff was hired by Defendants to work as a Busser at Defendants' Anytime Kitchen location at 23 West 32nd Street, 3rd Floor, New York, NY 10001. Approximately 6 months after Plaintiff's hiring, Defendants promoted Plaintiff to a Server. Plaintiff's employment with Defendants was terminated in or around September 2025.

58. Despite Plaintiff's titles as Busser and Server, Defendants always required Plaintiff to perform the duties of multiple roles each workday. Throughout Plaintiff's employment, Plaintiff would regularly play multiple roles, including that of a Server, Busser, Food Runer, and Cashier, all in a single shift. Plaintiff's duties included, among other things: (i) taking orders, (ii) initiating sales, (iii) processing transactions, (iv) bussing, cleaning, and resetting tables, (v) running food and drink orders, (vi) sweeping and mopping the restaurant, (vii) cleaning the bathrooms, (viii) polishing silverware and glassware, and (ix) changing and taking out trash.

59. Throughout Plaintiff's employment, Defendants regularly scheduled Plaintiff to work six (6) days per week for a total of fifty-six (56) hours per week. In these 6-day workweeks, Plaintiff worked 10-hour shifts from 6:00 P.M. to 4:00 A.M. on Fridays and Saturdays, and 9-hour shifts from 4:00 P.M. to 1:00 A.M. on the remaining four workdays. Additionally, Defendants regularly required Plaintiff to work a 7th day for 9 hours, from 4:00 P.M. to 1:00 A.M. At all relevant times, Defendants scheduled FLSA Collective Plaintiffs and Class Members to work similar hours.

60. Moreover, Plaintiff was frequently required to work more hours than he was officially scheduled for. Depending on how busy a night was, Plaintiff would work more than an hour past his schedule every day, resulting in actual workweeks of sixty-two (62) hours for a six-day schedule and seventy-two (72) hours for a seven-day schedule.

61. Throughout Plaintiff's employment, Defendants compensated Plaintiff at a fixed weekly salary of $1,000.00 for his usual 56-hour 6-day schedule, regardless of the total amount of hours he actually worked during these 6 workdays. Additionally, when Defendants required Plaintiff to work a 7th day of the week, Defendants compensated Plaintiff at a fixed daily rate of $100.00 for Plaintiff's 7th workday of the week, regardless of the total amount of hours Plaintiff actually worked on his 7th workday of the week. At all relevant times, Defendants compensated FLSA Collective Plaintiffs and Class Members at similar fixed rates.

62. At the end of his employment, Defendants began reducing Plaintiff's hours as part of an attempt to force him out because of his age. When Plaintiff worked this reduced schedule, Defendants switched to compensating him at a daily rate based off of his previous weekly rate. This resulted in Plaintiff being paid $166.67 per day ($1,000.00 ÷ 6) while working his reduced schedule.

63. From the beginning of Plaintiff's employment until sometime in 2024, Defendants paid Plaintiff's weekly wages in cash, without providing him paystubs. From thereon until the end of Plaintiff's employment, Defendants paid Plaintiff's weekly wages by personal check, without providing him any paystubs. Defendants included Plaintiff's tip payments in the same check as his regular house pay, rather than issuing a separate payment, making it impossible for Plaintiff to independently verify the accuracy of his tip distributions. At all relevant times, Defendants similarly failed to provide Class Members with any paystubs with their weekly wage payments.

**ii. Plaintiff's Claims of Unpaid Overtime Premiums**

64. At all relevant times, Defendants failed to compensate overtime premiums to Plaintiff, FLSA Collective Plaintiffs, and Class Members for all hours they worked over 40 hours per workweek due to Defendants' policy of improper fixed salary compensation, in violation of the FLSA, the NYLL, the NJWHL, and the NJWPL.

65. Throughout Plaintiff's employment, Defendants regularly scheduled Plaintiff to work a 56-hour 6-day schedule and compensated Plaintiff at a fixed weekly salary of $1,000.00 for all 56 hours of Plaintiff's 56-hour 6-day schedule. Additionally, Defendants would regularly require Plaintiff to work an extra, 7th day of nine (9) hours beyond his 56-hour schedule, which Defendants would compensate Plaintiff $100.00 for. There was never any agreement between Plaintiff and Defendants that Defendants' weekly salary structure of $1,000.00 per 56 hours, or their $100.00 payments for the extra 7th day with 9 hours of overtime, would include any overtime premium rates or cover Plaintiff's overtime hours.

66. Defendants never tracked Plaintiff's hours or paid him based on the number of hours that he worked. If Plaintiff worked a greater or lesser amount of hours than normal on a given day or during a given week, his pay did not change. The only time that Defendants adjusted Plaintiff's pay was when he worked a 7th day in a week, upon which he would be compensated an extra $100.00, again with no consideration as to the number of hours worked on that day.

67. Even though Plaintiff was compensated on a salary basis, he was never eligible to be classified as an exempt, salaried employee. In New York City, the minimum salary for an employee to compensated on an exempt basis is $1,237.50 per week in 2025. Furthermore, Plaintiff also did not meet any of the "duties" requirements, as he did not supervise any other employees, make any business- or corporation-level decisions, or possess advanced knowledge

necessary for the completion of his duties. As a result of Defendants' misclassification, Defendants failed to provide Plaintiff with a separate overtime premium rate at one-and-one-half times his regular hourly rate throughout his entire employment. Plaintiff was therefore not compensated any overtime premiums for 16 to 25 hours of overtime work each workweek.

68. As Plaintiff actually worked sixty-two (62) hours for a six-day schedule and seventy-two (72) hours for a seven-day schedule, even assuming, *arguendo*, that Defendants intended their fixed compensation to cover overtime premiums for all hours worked, the resulting regular rate would be $13.70 per hour for six-day workweeks and $12.50 per hour for seven-day workweeks—well below the prevailing New York State minimum wage throughout the entirety of Plaintiff's employment.

69. At all relevant times, Defendants similarly failed to compensate overtime premiums to FLSA Collective Plaintiffs and Class Members, subjecting them to the same policy of fixed weekly or daily salaries without any agreement that such salaries were intended to cover overtime hours. FLSA Collective Plaintiffs and Class Members were similarly required to work beyond their scheduled hours and were similarly compensated at effective hourly rates below the prevailing minimum wage.

70. At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to compensate overtime premiums to Plaintiff, FLSA Collective Plaintiffs, and Class Members for all their hours worked over 40 hours per workweek, in violation of the FLSA, the NYLL, the NJWHL, and the NJWPL.

**iii. Plaintiff's Claims of Unpaid Spread-of-Hours Premiums**

71. At all relevant times, Defendants failed to pay Plaintiff and New York Subclass Members their owed spread-of-hours premiums. The NYLL requires that any non-exempt

employee who works a workday in which the start time and end time are more than ten hours apart is owed the equivalent of one hour's pay at the applicable minimum wage rate. As described above, Plaintiff was a non-exempt employee and was regularly scheduled and required to work shifts exceeding ten hours in length. Although Plaintiff worked such shifts nearly every week, Defendants never compensated him his owed spread-of-hours premiums. Other New York State Subclass Members were similarly required to work regular shifts exceeding ten hours in spread, but were not compensated the legally required spread-of-hours premiums.

72. At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to compensate Plaintiff and New York Subclass members spread-of-hours premiums, in violation of the NYLL.

**iv. Plaintiff's Claims of Tip Retention**

73. At all relevant times, Defendants failed to properly distribute Plaintiff's, tipped FLSA Collective Plaintiffs', and Tipped Subclass Members' tips due to Defendants' policy of tip retention, in violation of the FLSA, the NYLL, the NJWHL, and the NJWPL.

74. At all relevant times, front-of-house employee who worked at Defendants' Restaurants were subjected to a mandatory tip pool by Defendants. However, Defendants allowed their managers, who managed the tip pool and distributed the tips, to include themselves in the tip pool.

75. Throughout Plaintiff's employment, Plaintiff worked under the management of Defendants' manager, Jason [LNU]. At all relevant times, Defendants granted Jason the power and authority to manage Anytime Kitchen's tip pool and to distribute the pool's tips to Defendants' employees, including Plaintiff. However, throughout Plaintiff's employment, Jason (with permission from Defendants) included himself in the tip pool and distributed excessively large

portions of the tips for himself.

76. As a Server (who also filled the role of Cashier), Plaintiff directly took orders for Defendants' customers, initiated their sales, and processed their transactions. Through these duties, Plaintiff was able to make direct observations as to the amounts of tips he directly earned.

77. Throughout Plaintiff's employment, Plaintiff directly observed that the amounts of tips Defendants paid him each week was significantly lower than the tips he had actually earned through the services he provided and the transactions he processed. For example, during the last week of Plaintiff's employment, Plaintiff earned approximately $900.00 in tips across just two workdays. However, Defendants' wage payment to Plaintiff for this workweek was only $230 with tips and wages included. Given that Plaintiff's daily rate would be around $166.66 ($1,000/6), Plaintiff was not paid any tips at all for that week.

78. Such glaring deficiencies and shortfalls in his tip pay made Defendants' tip retention obvious to Plaintiff. Although there was a tip pool, because Plaintiff typically filled all three roles of Server, Busser, and Food Runner, simultaneously there were far fewer support staff for the tips to be distributed to compared to other restaurants. Given the size of the tips that Plaintiff knew that he received and the number of employees in the tip pool,  Plaintiff knew his tips should have been distributed majorly or entirely to Plaintiff. For Plaintiff to have received only $50.00 in tips out of $900.00 earned, there would have had to have been seventeen other tipped employees. Given these extreme shortfalls and Manager Jason's inclusion in the tip pool, Defendants were obviously retaining a portion of Plaintiff's tips.

79. Despite retaining an enormous portion of the tip pool, Manager Jason was not eligible to participate in Defendants' tip pool at any relevant time. Jason was Defendants' agent at the restaurant; he could hire and fire workers, set schedules, make purchases, and direct employees

in their regular duties. At no point did Jason regularly perform tipped work as a regular part of his duties. For these reasons, Jason's self-inclusion in the tip pool, and Defendants' permittance of his self-inclusion, was prohibited by New York State law (*see* 12 N.Y.C.R.R. § 146-2.16) and New Jersey State law (*see* N.J. Admin. Code 12:56-3.5).

80. At all relevant times, Defendants also failed to pay tipped FLSA Collective Plaintiffs and Tipped Subclass Members the full amount of their properly owed tips because Defendants similarly subjected them to invalid tip pools which included managers or other non-eligible employees.

81. At all relevant times, Defendants knowingly and willfully operated their business with a policy of retaining Plaintiff's, tipped FLSA Collective Plaintiffs', and Tipped Subclass Members' tips, in violation of the FLSA, the NYLL, the NJWHL, and the NJWPL.

**v. Plaintiff's Claims of Violations of the WTPA and NJWPL § 34:11-4.6**

82. At all relevant times, Defendants failed to provide wage notices and accurate wage statements to Plaintiff and New York Class Members, in violation of the Wage Theft Protection Act ("WTPA")—incorporated into the NYLL.

83. At all relevant times, Defendants failed to provide wage notices and accurate wage statements to New Jersey Class Members, in violation of the NJWPL, N.J. Stat. Ann. § 34:11-4.6.

84. At all relevant times, Defendants paid Plaintiff and Class Members either in cash or by personal check, and failed to provide any paystubs to them with every weekly payment.

85. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. Following the decision in *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 303 (2d Cir. 2024), Courts have generally held that there is no categorical bar on Article III

standing for WTPA claims. Instead, the Second Circuit found that "[t]he lack of such notices and statements might impair 'an employee's ability to seek relief for violations they may not have information about'" to an extent sufficient to support standing.

86. New York Court continue to find sufficient standing to support standing to support these claims. One such Court stated the following at Summary Judgment:

> "Here, the Court determines that Plaintiffs have adequately alleged and established actual and concrete downstream harm as a result of Defendants' failure to provide the required wage and hour notices and wage statements. Plaintiffs have shown that "Defendants' violations impaired their ability to seek relief due to a lack of information." More than that, Plaintiffs have proved, and the Court agrees, that Defendants' failure to maintain proper wage statements because of their automatic meal-break deduction and eight-hour rounding led Plaintiffs to lose wages. These are exactly the types of harm that the Second Circuit considered to be sufficient to establish standing in *Guthrie*. Therefore, the Court finds for Plaintiffs on this issue."

*Sanchez v. Clipper Realty, Inc.*, 2026 U.S. Dist. LEXIS 36716, *61 (S.D.N.Y. February 23, 2026) (internal citations omitted).

87. New Jersey Courts have found "that because "[e]mployees are the obvious special beneficiaries of the [New Jersey Wage Payment Law]," this statute should be read to "impliedly confer[] on employees a private right of action in court against employers . . . to protect and enforce their rights thereunder." *Winslow v Corporate Exp., Inc.*, 364 N.J. Super. 128 (Super. Ct. App. Div. 2003) (quoting *Mulford v. Computer Leasing, Inc.*, 334 N.J. Super. 385 (Super. Ct. 1999)). Additionally, New Jersey Courts have granted judgments in favor of plaintiffs for claims of violations under N.J. Stat. Ann. § 34:11-4.6. *See Saiyed v Archon, Inc.*, 2021 U.S. Dist. LEXIS 53465 (D.N.J. Feb. 25, 2021).

88. Here, Defendants' conduct is has led to exactly the kind of injury contemplated in *Guthrie* and *Sanchez.* By failing to inform Plaintiff and Class Members of the actual hours that they worked by not providing them with wage statements, Defendants were able to hide their wrongdoing, as Plaintiff and Class Members were unaware of the fact that they were being

underpaid. Had Defendants provided proper wage statements to Plaintiff and Class Members which accurately listed the total number of hours Plaintiff and Class Members actually worked, as required by law, Defendants would have had to either (a) increase the wages to correspond to the hours actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the hours the employee actually worked.

89. By failing to report all of Plaintiff's and Class Members' hours, Defendants were able to reduce the employee earnings that they later reported to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. As a result, Plaintiff and Class Members were irreversibly injured with respect to their Social Security benefits—a fact which Defendants were able to hide from them by failing to provide them with proper wage statements.

90. Furthermore, Defendants failed to provide any wage notices to Plaintiff or Class Members. Once again, had Defendants provided Plaintiff and Class Members with wage notices that communicated the rates that Defendants actually intended to pay them, Plaintiff and Class Members would have been able to contest the unfair pay rates or choose not to take a job with Defendants. Instead, due to Defendants intentional hiding of that information, Plaintiff and Class Members accepted their employments with Defendants without the knowledge that Defendants did not intend to be bound to their promised pay rates.

91. Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiff and New York Class Members with wage notices and accurate wage

statements, in violation of the NYLL.

92. Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiff and New Jersey Class Members with wage notices and accurate wage statements, in violation of the NJWPL.

**vi. Plaintiff's Claims of Age Discrimination**

93. Throughout Plaintiff's employment with Defendants, Defendants discriminated against Plaintiff due to Plaintiff's age, in violation of the NYSHRL and the NYCHRL.

94. Plaintiff was born in 1966 and was 59 years old when Defendants' discriminatory conduct began.

95. For comparison, when Defendants' discriminatory conduct began, Individual Defendants SUNGKYU CHOI and YOUNGHOON CHOI were both approximately 44 years old and SEUNGEUN CHOI was approximately 31 years old.

96. At all relevant times, Defendants catered their Anytime Kitchen business to primarily younger customers by (i) creating a bright and vibrant atmosphere, (ii) utilizing props and decorations for visual entertainment, and (iii) fostering a community of younger individuals through digital marketing. Anytime Kitchen's favoritism for younger customers can be seen by the images on Defendants' social media profiles and Google review page.[15][16][17] Defendants post images of their customers on their social media profiles, however, Defendants clearly post images of younger customers almost exclusively, with very rare exceptions. *See* **Exhibit F**. Anytime Kitchen's Google reviews page also show a bias towards younger customers.[16]

97. During one of Plaintiff's shifts in or around June 2025, Plaintiff was working as a

---

[15] https://maps.app.goo.gl/yGFL41HCiVcYcSZS6
[16] https://www.instagram.com/anytimekitchen
[17] https://www.facebook.com/AnytimeNYC/photos

Server and filling in for other roles (including Busser, Food Runner, and Cashier) as usual. Throughout the night, Plaintiff was performing his usual duties of (i) taking orders, (ii) initiating sales, (iii) processing transactions, (iv) bussing, cleaning, and resetting tables, (v) running food and drink orders, (vi) sweeping and mopping the restaurant, (vii) cleaning the bathrooms, (viii) polishing silverware and glassware, and (ix) changing and taking out trash, among others. The restaurant was experiencing a high volume of business activity throughout the night, but at some point in the night, the volume of business became overwhelming for Plaintiff as he was required by Defendants to perform such a significant amount of duties on top of tending to Defendants' customers.

98. As a result of the overwhelming amount of business, Plaintiff asked Defendants' manager, Jason, to direct other employees on duty to assist Plaintiff in tending to Defendants' customers (hereby referred to as the "Request"). Plaintiff's Request was reasonable and logical considering (i) Defendants utilization of a tip pool, and (ii) it would ensure the utmost satisfaction of Defendants' customers. Additionally, this was the first time Plaintiff had ever made such a request to Defendants and their management.

99. However, instead of just simply assisting Plaintiff in tending to their own customers in the moment and then moving forward with rational detachment, Defendants and their management began to discriminate and retaliate against Plaintiff.

100. Following Plaintiff's Request, Defendants discriminatorily and retaliatorily reduced Plaintiff's weekly schedule, from 6 to 7 days per week down to 2 to 4 days per week, for the remainder of Plaintiff's employment. Around this same time, Defendants' management made comments to Plaintiff that they wanted to hire younger and faster staff—reflecting that Plaintiff's age was already a motivating factor in Defendants' employment decisions before his termination.

As a direct result of Defendants' discriminatory and retaliatory schedule reduction, Plaintiff's weekly earnings were significantly reduced, by up to over 71%.

101. Despite this discriminatory and retaliatory schedule reduction, Plaintiff complained to Manager Jason about his reduced hours. In response, Manager Jason told Plaintiff: "I need you to work less hours so I can give more hours to someone else who I am training to replace you." Nevertheless, Plaintiff persisted in continuing to work for Defendants, which caused Defendants to eventually escalate their discriminatory conduct. Finally, in or around September 2025, on Plaintiff's last day of employment, Plaintiff's manager, Jason, pulled Plaintiff into the manager's office and told Plaintiff: "Sorry, but the owners [the Individual Defendants] informed me that you're too old to continue working, and we're going to have to let you go." As a direct result of Defendants' discriminatory termination, Plaintiff suffered from loss of future earnings.

102. Defendants' behavior, schedule reduction, and termination of Plaintiff's employment were all clearly illegitimate, discriminatory, and based entirely upon Plaintiff's age. Plaintiff worked for Defendants for 4 years, 6 to 7 days per week, and performed multiple roles each day. Additionally, Plaintiff was capable of earning a promotion from Busser to Server in merely 6 months. Plaintiff had never made any prior requests for assistance other than the one time which caused Defendants' discriminatory conduct to begin. Accordingly, Plaintiff was clearly a proficient and capable employee. Defendants had clearly already wanted to terminate Plaintiff prior to his Request, due to Plaintiff's age, in order to further cater their business to younger customers and due to Defendants' prejudice. Any other reasons Defendants may provide for reduction in Plaintiff's scheduling and/or their termination of Plaintiff's employment as a defense to these claims are clearly pretextual.

103. Defendants' discriminatory conduct directly caused monetary and non-pecuniary

damages to Plaintiff. Plaintiff worked long and odd hours for Defendants' almost every day of the week over the course of 4 years despite Defendants' wage violations and blatant theft of his tips, only for his hard work to culminate in discriminatory and retaliatory conduct against him based upon his age.

104. As a direct and proximate result of the discriminatory conduct Plaintiff was forced to endure throughout his employment with Defendants, as well as his discriminatory termination, Plaintiff suffered from loss of past and future earnings as well as numerous non-pecuniary losses, including: (1) mental anguish and distress, (2) pain and suffering, (3) physical discomfort, (4) anxiety, (5) humiliation, (6) embarrassment, (7) inconveniences, (8) shock, (9) outrage, and (10) egregious emotional distress and trauma.

105. Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs, and Class Members in this litigation, and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## VIOLATIONS OF THE FAIR LABOR STANDARDS ACT

**(On behalf of Plaintiff and FLSA Collective Plaintiffs)**

106. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

107. At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

108. At all relevant times, Plaintiff and FLSA Collective Plaintiffs were covered

individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

109. At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

110. At all relevant times, Corporate Defendant had gross annual revenues in excess of $500,000.

111. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their overtime premiums for all hours worked over 40 hours per workweek, due to Defendants' policy of improper fixed salary compensation.

112. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs the full amount of their properly owed tips due to Defendants' policy of tip retention.

113. Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

114. Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs their proper wages, including their proper overtime premiums, when Defendants knew or should have known such was due.

115. Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

116. As a direct and proximate result of Defendants' willful disregard of the FLSA,

Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

117. Due to the intentional, willful and unlawful acts of Defendants, Plaintiff suffered damages in an amount not presently ascertainable of (i) unpaid overtime wages, (ii) unpaid tips, and (iii) liquidated damages of unpaid overtime and tips.

118. Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

**COUNT II**

**VIOLATIONS OF THE NEW YORK LABOR LAW**

**(On behalf of Plaintiff and New York Subclass Members)**

119. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

120. At all relevant times, Plaintiff and New York Subclass Members were employed by the Defendants within the meaning of the New York Labor Law, §§ 2 and 651.

121. Defendants willfully violated Plaintiff's and New York Subclass Members' rights by subjecting them to a policy of improper fixed salary compensation resulting in unpaid minimum wages and overtime premiums.

122. Defendants willfully violated Plaintiff's and New York Subclass Members' rights by failing to pay them spread-of-hours premiums for shifts worked with a spread of more than ten hours.

123. Defendants willfully violated Plaintiff's and New York Subclass Members' rights by subjecting them to a policy of tip retention resulting in unpaid tips.

124. Defendants failed to properly notify employees of their hourly pay rate and

overtime rate, in direct violation of the New York Labor Law.

125. Defendants failed to provide Plaintiff and New York Subclass Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law.

126. Defendants failed to provide Plaintiff and New York Subclass Members with proper wage statements with every payment as required by New York Labor Law § 195(3).

127. Due to the Defendants' New York Labor Law violations, Plaintiff and New York Subclass Members are entitled to recover from Defendants their (i) unpaid minimum wages, (ii) unpaid overtime premiums, (iii) unpaid tips, (iv) unpaid spread of hours premiums, (v) liquidated damages of unpaid wages, overtime, tips, and premium pay, (vi) statutory penalties, (vii) reasonable attorney's fees, and (viii) costs and disbursements of this action, pursuant to New York Labor Law.

**COUNT III**

**VIOLATIONS OF THE NEW JERSEY WAGE AND HOUR LAW AND THE NEW JERSEY WAGE PAYMENT LAW**

**(On behalf of New Jersey Class Members)**

128. Plaintiff realleges and reavers all the above allegations of this Complaint as fully set forth herein.

129. At all relevant times, Defendants were employers within the meaning of New Jersey Statutes Annotated 34:11-56a1(g) and New Jersey Statutes Annotated 34:11-4.1.

130. At all relevant times, New Jersey Class Members were employed by Defendants within the meaning of the New Jersey Statutes Annotated 34:11-56a1(h) and New Jersey Statutes Annotated 34:11-4.1.

131. At all relevant times, Defendants engaged in a policy and practice of not compensating New Jersey Class Members all their proper minimum wages and overtime premiums due to Defendants' policy of improper fixed salary compensation, in direct violation of the NJWHL and NJWPL.

132. At all relevant times, Defendants engaged in a policy and practice of not compensating New Jersey Class Members the full amount of their properly owed tips due to Defendants' policy of tip retention, in direct violation of the NJWHL and NJWPL.

133. Due to Defendants' NJWHL and NJWPL violations, New Jersey Class Members are entitled to recover from Defendants their (i) unpaid minimum wages, (ii) unpaid overtime wages, (iii) unpaid tips, (iv) liquidated damages of unpaid wages, overtime, and tips, (v) reasonable attorney's fees, and (vi) costs and disbursements of the action, pursuant to the NJWHL and NJWPL.

## COUNT IV

## DISCRIMINATION AND RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

**(N.Y. Exec. Law §§ 292, *et seq*.)**
**(On Plaintiff's behalf only)**

134. Plaintiff realleges and reavers all the above allegations of this Complaint as fully set forth herein.

135. The New York State Executive Law § 296(1)(a) provides that:

> "It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, [...] color, national origin, […] to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

136. The New York State Executive Law § 296(7) provides that:

> "It shall be an unlawful discriminatory practice for any person engaged in

> any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint"

137. As factually described above, Defendants violated Plaintiff's statutorily protected rights under the New York State Human Rights Law by engaging in discriminatory and retaliatory employment practices (schedule reduction and termination) against Plaintiff based on Plaintiff's age.

138. This discriminatory and retaliatory conduct was intentional, malicious, willful, and performed in reckless disregard of Plaintiff's protected rights under the NYSHRL.

139. As a direct and proximate result of Defendants' willful disregard of the NYSHRL, Plaintiff suffered damages in the form of loss of past and future earnings, numerous past and future non-pecuniary losses, and the costs of bringing this action. Plaintiff seeks all applicable remedies under the law, including (1) an injunction ordering Defendants to cease their discriminatory practices as described herein, (2) compensatory damages, back pay, and front pay, (3) punitive damages and egregious emotional distress damages, and (4) attorneys' fees and costs.

## COUNT V

## DISCRIMINATION AND RETALIATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

**(N.Y.C. Admin. Code §§ 8-101, *et seq.*)**
**(On Plaintiff's behalf only)**

140. Plaintiff realleges and reavers all the above allegations of this Complaint as fully set forth herein

141. The New York City Administrative Code §8-107(1)(a) provides that:

> "1. It shall be an unlawful discriminatory practice:
>
> For an employer or an employee or agent thereof, because of the actual or perceived age, race, […] color, national origin […] of any person:

> (1) To represent that any employment or position is not available when in fact it is available;
>
> (2) To refuse to hire or employ or to bar or to discharge from employment such person; or
>
> (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

142. The New York City Administrative Code §8-107(7) provides that:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint"

143. As factually described above, Defendants violated Plaintiff's statutorily protected rights under the New York City Human Rights Law by engaging in discriminatory and retaliatory employment practices (schedule reduction and termination) against Plaintiff based on Plaintiff's age.

144. This discriminatory and retaliatory conduct was intentional, malicious, willful, and performed in reckless disregard of Plaintiff's protected rights under the NYCHRL.

145. As a direct and proximate result of Defendants' willful disregard of the NYCHRL, Plaintiff suffered damages in the form of loss of past and future earnings, numerous past and future non-pecuniary losses, and the costs of bringing this action. Plaintiff seeks all applicable remedies under the law, including (1) an injunction ordering Defendants to cease their discriminatory practices as described herein, (2) compensatory damages, back pay, and front pay, (3) punitive damages and egregious emotional distress damages, and (4) attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, respectfully requests that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the FLSA, the NYLL, the NJWHL, the NJWPL, the NYSHRL, and the NYCHRL;

b. An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c. An award of unpaid minimum wage and unpaid overtime premiums as a result of Defendants' policy of improper fixed salary compensation, due under the FLSA, the NYLL, the NJWHL, and the NJWPL;

d. An award of unpaid spread-of-hours premiums as a result of Defendants' policy of improper fixed salary compensations, due under the NYLL;

e. An award of unpaid tips as a result of Defendants' policy of tip retention, due under the FLSA, the NYLL, the NJWHL, and the NJWPL;

f. An award of unpaid tips as a result of Defendants' policy of retaining tips through an invalid tip pool, due under the FLSA, the NYLL, the NJWHL, and the NJWPL;

g. An award of statutory penalties as a result of Defendants' failure to comply with the NYLL's wage notice and wage statement requirements;

h. An award of statutory penalties as a result of Defendants' failure to comply with the NJWPL's wage notice and wage statement requirements;

i. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to 29 U.S.C. § 216;

j. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to the NYLL;

k. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to the NJWHL;

l. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to the NJWPL;

m. An award of compensatory damages, back pay, front pay, punitive damages, and damages for egregious emotional distress as a result of Defendants' discriminatory and retaliatory conduct, due under the NYSHRL and the NYCHRL;

n. An award of pre-judgment and post-judgment interests, costs, and expenses of this action together with reasonable attorneys' and experts' fees and statutory penalties;

o. Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

p. Designation of this action as a class action pursuant to F.R.C.P. 23;

q. Designation of Plaintiff as Representative of the Class; and

r. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: March 24, 2026
New York, New York

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181

*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*

By: /s/ *C.K. Lee* ______________________
C.K. Lee, Esq.